1  ROBERT WAGGENER - SBN - 118450
2  214 DUBOCE AVENUE
   SAN FRANCISCO, CA 94103
   Phone:      (415) 431-4500
3  Fax:        (415) 255-8631
   E-Mail:     rwlaw@mindspring.com
4
   Attorney for Defendant KEITH MAYFIELD
5

6
                    **UNITED STATES DISTRICT COURT**
7
                    **NORTHERN DISTRICT OF CALIFORNIA**
8

9  UNITED STATES OF AMERICA               No.  4:15 CR 00290-001 PJH

10                          Plaintiff,    **DEFENDANT KEITH RAMON**
                                          **MAYFIELD'S SENTENCING**
11         v.                             **MEMORANDUM AND REQUEST FOR**
                                          **DOWNWARD VARIANCE [18 U.S.C. §**
12 KEITH MAYFIELD,                        **3553 [(a)(1)]**

13                          Defendant.
   _____/      Date:  August 15, 2018
14                                         Time:  2:30 p.m.
                                           Judge: Honorable Judge Phyllis J. Hamilton
15

16                          **INTRODUCTION**

17         Thirty-eight year old defendant Keith Mayfield appears before this Court for sentencing

18 following his conviction of Conspiracy To Distribute Marijuana and Possession With Intent To

19 Distribute Marijuana (21 U.S.C.§§ 846 and 841 (b)(1)(B)), violating airport security

20 requirements (49 U.S.C. §§ 46314 (c) and (b)(2)), and money laundering (18 U.S.C. § 1956(h)).

21 The Presentence Report (PSR) was prepared by United States Probation Officer Karen L. Mar

22 and she has calculated Mr. Mayfield's guidelines to be a Total Offense Level 30, with a Criminal

23 History Category of I, calling for an advisory guideline sentence of 97 to 120 months. Ms. Mar

24 has recommended that Mr. Mayfield be sentenced to the low end of that guideline range, 97

25 months in prison.

26         Defendant objects to the guideline calculation on several levels and submits that the total

27 offense level should be calculated at 23, including a safety valve reduction based on Mr.

28

**DEFENDANT MAYFIELD'S**
**SENTENCING MEMORANDUM**

1  Mayfield's lack of a criminal record.  Mr. Mayfield faces a mandatory minimum sentence of five

2  years based on the amount of marijuana connected to his criminal conduct, and it is submitted

3  that any sentence greater than 60 months is unjustified and inappropriate.

4  **I.**

5  **THE OFFENSE CONDUCT**

6  The Court is generally aware of the factual background of this case, having presided over

7  the litigation in this case and the sentencing of 10 co-defendants.  Mr. Mayfield was a baggage

8  handler for Southwest Airlines from 2005 through 2015.  Mr. Mayfield's criminal conduct

9  occurred between the summer of 2012 and May of 2015.  Two of his co-defendants, Kenneth

10  Wayne Fleming Jr. and Michael Herb Videau, were also baggage handlers.  The three men

11  facilitated the distribution of marijuana throughout the United States by violating airport security

12  procedures.  Multi-kilo amounts of marijuana were illegally distributed by means of couriers who

13  carried the marijuana in luggage on planes to various destinations after bag-switch steps were

14  taken by the baggage handler to avoid security checkpoints.  Marijuana was also distributed by

15  Mr. Mayfield through Southwest Airlines cargo shipments.  All the men performed their roles for

16  profit and laundered the proceeds of their illegal activity.

17  The baggage handler role in the overall marijuana distribution scheme is demonstrated by

18  the paragraphs within the Mayfield PSR describing the role of Mr. Fleming in the distribution of

19  marijuana on a flight from Oakland, California to Nashville, Tennessee on May 16, 2013. (PSR

20  ¶ 23-32)[1] On that date, Kameron Kordero Eldridge Davis (Davis) was a passenger on a

21  Southwest Airlines flight that flew to Nashville.  DEA agents approached Davis in the Nashville

22  airport and searched his backpack.  The search revealed eleven separately wrapped one pound

23  packages of marijuana.  Davis then went on to describe how he came to bring the marijuana to

24  Nashville and the people involved.

25

26  _____

27  [1]One of the specific trafficking transactions by Mr. Mayfield on February 10, 2014 is also summarized within the PSR at paragraph 35, but the 10 paragraphs regarding the Fleming transaction give a better flavor for the overall scheme, the role of baggage handlers, and the

28  number of participants and moving parts in the operation.

**DEFENDANT MAYFIELD'S**
**SENTENCING MEMORANDUM**

1    Davis was introduced to a person in California who he knew as "Antonio", who asked

2    him if he was interested in being paid to transport marijuana.  He agreed, and then made 3 to 4

3    trips to Nashville transporting marijuana in his carry on luggage, including on May 16.  Davis

4    was paid $600.00 to $800.00 per trip by Antonio, who delivered the marijuana to Davis' Bay

5    Area home and instructed him to contact a Southwest Airlines employee to help him get the

6    marijuana past security.  Davis would then contact the Southwest employee, in this case Kenneth

7    Wayne Fleming Jr. (Fleming), and meet him near the airport on the scheduled date of travel.

8    Fleming would take the marijuana and give Davis instructions on where to meet within the

9    airport.  At the designated location on the second floor of the terminal, Fleming would provide

10   Davis with the piece of luggage containing marijuana.

11   Davis was given information by Antonio as to who to contact in Nashville to deliver the

12   marijuana.  Davis only knew this person as "R", but was able to specifically describe the vehicle

13   driven by "R" when he previously delivered him marijuana.  DEA agents detained the uncharged

14   co-conspirator believed to be "R" in the arrivals section of the Nashville airport on May 16.  "R"

15   cooperated with the agents and gave them approximately $24,000.00 in cash that he was to give

16   to Davis before his return trip to Oakland.  Follow up investigation by the agents, including

17   review of surveillance video and security badge swipe information, clearly revealed that Fleming

18   was the Oakland Southwest Airlines employee who had avoided airport security earlier and

19   brought the baggage containing marijuana to Davis.

20   The point of the above summary is to show that the Oakland Southwest Airlines

21   employee baggage handler role was to facilitate the marijuana transfer within the airport, and that

22   there were other individuals coordinating the initial delivery and packaging of the marijuana, as

23   well as the pickup and payment in cities throughout the United States.  The *modus operandi* for

24   Southwest employees Mr. Fleming, Mr. Mayfield, and Mr. Videau in Oakland was basically the

25   same, the skirting of security with a package, and the delivery to the courier.  There is no

26   indication that any of these men had access to, or were responsible for, the marijuana packaging

27   or supply, or that they were involved in the transportation or delivery of large sums of money.

28   Mr. Mayfield certainly was more active than Fleming or Videau as to the the number of security

**DEFENDANT MAYFIELD'S**
**SENTENCING MEMORANDUM**

3

1   violations and transactions, and he also used his discount as a Southwest employee to ship

2   marijuana cargo, but none of these men had managerial or supervisory roles in the operation.

3   The scheme could not have worked without them, and there were major breaches of security, but

4   they were soldiers paid on a transactional basis, X dollars per breach.  They were not the generals

5   controlling the supply and reaping the major profits.

6                                                  **II.**

7                                    **THE PRESENTENCE REPORT**

8          Defendant Mayfield has a large number of objections to the contents of the PSR which

9   are set out within this sentencing memorandum. The objections are set out below by page and

10  paragraph number.

11         Counsel sent a five page letter to the probation officer in this case objecting to the content

12  and conclusions of various portions of the draft PSR and/or suggesting clarifications or

13  modifications. Some of those changes have been made, some have been noted within various

14  paragraphs (See, PSR ¶¶ 22, 36, 39 and 40), and then some are addressed in summary fashion as

15  Probation Officer's Response to Objection Number 1 in the Addendum to the Presentence

16  Report. As will be seen below, along with making objections to factual content issues, counsel

17  will discuss and break down the various specific guideline issues labeled "Objection Number 1"

18  by the probation officer, including: (1) whether Mayfield is deserving of a two level upward

19  adjustment for a pattern of criminal conduct engaged in as a livelihood (PSR ¶ 46, USSG

20  §2D1.1(b)(15)(E); (2) whether Mayfield is deserving of an aggravated role adjustment (PSR ¶

21  50, USSG §3B1.1); whether Mayfield is eligible for the safety valve provision given that he has

22  no prior criminal record (USSG §5C1.2(a)(1)-(4)); and whether there is an issue of disparity of

23  sentences among defendants with similar records who have been found guilty of similar conduct.

24  (PSR ¶¶ 128-129, 18 U.S.C. §3553(a)(6)).

25  **Page 5 ¶17**

26         By way of an update, counsel verified today that Mr. Mayfield has been in continuous

27  compliance with his conditions of release since May of 2015, and has not incurred any arrests or

28

**DEFENDANT MAYFIELD'S**
**SENTENCING MEMORANDUM**

1  technical violations.  This information was shared with the prosecutor and the probation officer,
2  and the PSR should be modified with this new information
3  **Page 10 ¶ 36**
4         In his plea agreement, Mr. Mayfield has admitted that he smuggled marijuana at the
5  airport on at least 40 occasions.  He has also admitted that he breached the security at the airport
6  on a total of approximately 70 occasions, but has clarified that not all of those occasions involved
7  marijuana smuggling or the smuggling or illegal contraband or controlled substances.  The body
8  of this PSR paragraph implies that "on each occasion" that airport security was breached, that the
9  luggage passed to the outbound passenger contained no less than four pounds of marijuana.  That
10  is not true.  The "on each occasion" reference should be modified to "on each occasion where
11  marijuana was smuggled".[2]
12  **Page 11 ¶ 39**
13         Defendant objects to the vague assertion that he "provided co-conspirators with
14  directives, provided instructions to couriers, and recruited co-defendant Sophia West and advised
15  her to "be ready".'  Defendant's position is stated at the end of this PSR paragraph, and
16  arguments as to these conclusions by the probation officer are contained in the section below
17  challenging an aggravated rule adjustment for the defendant.  As to Sophia West, advising her to
18  "be ready" is not recruitment.  Mayfield's role was to coordinate the bag switch with the courier
19  such as Sophia West, nothing more.  He did not recruit her, pay her, buy her plane ticket, or
20  direct any of her activities after he handed her luggage.
21  **Page 11 ¶ 40**
22         The summaries of Mr. Mayfield's finances and banking activity unfairly portray Mr.
23  Mayfield's financial situation and is improperly presented to substantiate a two level upward
24
25  [2] The same issue as to the number of marijuana smuggling transactions contrasted with
26  the number of airport security breaches is then confusingly repeated in the Probation Officer's
Response to Objection Number 1 and then the Sentencing Recommendation.  The plea
agreement in this case makes clear that Mr. Mayfield is on the hook for smuggling marijuana at
27  least 40 times involving no less than 250 kilos of marijuana.  Those amounts should be
consistent throughout, rather than inferring that there was a greater amount of smuggling taking
28  place.

1  adjustment for "criminal livelihood", that criminal conduct was his primary source of income

2  (discussed below).

3      It is true that W-2s for Mr. Mayfield from Southwest Airlines indicate wages of

4  $9,760.71 in 2012, $7,939.81 for 2013 and $6,579.25 for 2014.[3]  What is not accounted for with

5  these W2s and other Southwest records is the fact that Mr. Mayfield was on disability for work

6  related injuries on numerous occasions between 2010 and 2015, sometimes for months at a time,

7  for back strain issues and other injuries to his limbs.  In other words, he had another source of

8  income to make up for the wages he was receiving for being out of work for Southwest.  Mr.

9  Mayfield has been steadily employed since he was a teenager, and his wife has also been

10  regularly employed.  Mr. Mayfield has admitted laundering approximately $50,000 and has

11  agreed to the forfeiture of $50,000.00.  Southwest Airlines, disability, and criminal conduct as a

12  baggage handler were not Mr. Mayfields's only sources of income in the couple of years leading

13  up to his arrest.  The probation officer repeatedly references $122,900.00 of "suspicious"

14  deposits in Mayfield's bank account from 2012 to 2014, and then comes to the bold conclusion

15  that criminal conduct provided his primary source of income.[4]  She is simply not in a position to

16  make that assessment without actually examining the foundation for the conclusion.

17      Attached hereto as exhibits A, B, and C are financial documents concerning Mr. Mayfield

18  in the time frame of 2012 to 2014 which provide alternative explanations for his livelihood and

19  support of himself and his family, and his banking transactions.  Mr. Mayfield is not the best

20  record keeper or historian, but these exhibits shed some light on the "suspicious" financial

21  dealings of the defendant and how he was able to support himself.

22      Mr. Mayfield was in a position to loan his friend Durian Dunbar money in 2012, funded

23  by savings and, in part, his 401(k).  Mr. Dunbar was trying to get started in the music business

24

25      [3] Further financial informaton produced by Southwest Airlines indicate that Mayfield's
gross wages were $12,374.41 for 2012, $10,517.11 for 2013, and $23,990.33 for 2014.

26

27      [4]The probation officer does note the statement in defense counsel's letter regarding the
draft PSR that there were alternative explanations for the overall wages and other sources of
income, but there was never any follow up to counsel's invitation to meet and confer on these

28  issues, or provide further explanation or documentation.

**DEFENDANT MAYFIELD'S**
**SENTENCING MEMORANDUM**

1  and Mr. Mayfield saw clear to loan him $40,000.00 which was paid back in 10 months with

2  $4,000.00 monthly installments.  The contract for this loan is attached as Exhibit A.  The loan

3  was timey repaid, meaning that Mayfield had a steady stream of income after the April 2012

4  loan.

5      Mr. Mayfield has a financial sideline of fixing up cars for resale.  In that regard, he sold

6  two cars to two brothers in Texas in 2012-2013, a Cadillac Escalade and a GMC El Camino. He

7  sold the El Camino for $48,000.00 and he sold the Escalade for $29,000.00. Mr. Askew lives in

8  Dallas, Texas, and Mr. Williams lives in Rowlett, Texas, which is not far from Dallas. Both of

9  these men wired money to Mr. Mayfield from Texas, which explains at least a portion of the

10  "suspicious" wire transfers from Texas.

11      Attached hereto as Exhibit B is a set of documents regarding the sale of the Cadillac

12  Escalade to Kendrick Askew and Zakia Pierce, which includes a note written by Kendrick

13  Askew, documentation of Mr. Mayfield's purchase and payments for the automobile from

14  Statewide Auto Sales, a 2015 notice of the California registration suspension for the vehicle, and

15  correspondence of Mr. Mayfield with Statewide Auto Sales. What happened was that Mr.

16  Mayfield transferred the vehicle to Mr. Askew, forgetting that he still owed Statewide Auto Sales

17  a final payment for the vehicle. Statewide Auto Sales ended up repossessing the vehicle from Mr.

18  Askew in 2016. Mr. Mayfield then had to pay off his balance with Statewide Auto Sales to get

19  the car back to Mr. Askew and get him the title from Statewide.

20      Exhibit C is a set of documents, relating to the sale of the GMC El Camino to Calvin

21  Williams, which includes a note from Calvin Williams, a prior transmission repair receipt for the

22  El Camino paid by Mr. Mayfield, and then a 2013 pink slip and transfer of title of the El Camino

23  from Mr. Mayfield's wife to Mr. Williams in July of 2013.  Mr. Mayfield and his wife were

24  receiving income from the sale of these cars and were not living off the proceeds of the airport

25  security violations.

26  **Page 11-12 ¶ 42**

27      Mr. Mayfield has clearly accepted responsibility for his criminal conduct and is sincerely

28  remorseful.  His introduction to the criminal element was when he began making easy money

DEFENDANT MAYFIELD'S
SENTENCING MEMORANDUM

1   from his Southwest Airlines job by selling "buddy passes", allowing cheaper air travel with

2   Southwest to friends and associates.  That commerce led to him being approached about

3   violating airport security to get bags of marijuana on planes, and that obviously led to his arrest.

4   Even when it became known to him that couriers had been arrested, he foolishly continued in his

5   criminal conduct and he must now pay the consequences.

6   **Page 15 ¶ 65**

7        This error was not caught while reviewing the draft PSR, but Mr. Mayfield contends that

8   he was never detained in San Francisco for resisting arrest.  His suspicion is that someone used

9   his name and DOB in 2007.  The dated incident is not of great consequence and there is no

10  criminal history point associated with the incident.  On another note of similar importance, in her

11  sentencing recommendation the probation officer mentions that Mr. Mayfield was arrested on

12  four occasions from ages 20-29, all with charges not filed or dismissed.  The reality is that he has

13  only been arrested once when he was 20 years old, and then detained twice and released.  The

14  arrest was the only day he ever spent in jail before this case.

15  **Page 18 ¶ 86**

16       Lower back problems for Mr. Mayfield actually go back to 2011 when he was working

17  for Southwest. The injuries resulted in him taking time off work and being on disability as

18  previously noted. The paragraph should be modified to reflect that Mr. Mayfield has a history of

19  back problems in order to assure it is known to the Bureau of Prisons while he is incarcerated.

20                           **III.**

21                 **SENTENCING GUIDELINE ISSUES**

22  **A.     Criminal Livelihood**

23       The probation officer has assessed a two level upward adjustment for a pattern of

24  criminal conduct engaged in as a livelihood (PSR ¶ 46, USSG §2D1.1(b)(15)(E).[5]

25

26  _____

27      [5]According to the Application Notes, "For purposes of subsection (b)(15)(E), "pattern of criminal conduct" and "engaged in as a livelihood" have the meaning given such terms in § 4B1.3 (Criminal Livelihood)."

28

**DEFENDANT MAYFIELD'S**
**SENTENCING MEMORANDUM**

(C)  Pattern of Criminal Conduct Engaged in as a Livelihood (Subsection (b)(15)(E)). USSG §4B1.3 states "If the defendant committed an offense as part of a pattern of criminal conduct engaged in as a livelihood, his offense level shall be not less than 13, unless § 3E1.1 (Acceptance of Responsibility) applies, in which event his offense level shall be not less than 11." According to the Application Notes for USSG §4B1.3:

> 1. "Pattern of criminal conduct" means planned criminal acts occurring over a substantial period of time. Such acts may involve a single course of conduct or independent offenses.

> 2. "Engaged in as a livelihood" means that (A) the defendant derived income from the pattern of criminal conduct that in any twelve-month period exceeded 2,000 times the then existing hourly minimum wage under federal law; and (B) the totality of circumstances shows that such criminal conduct was the defendant's primary occupation in that twelve-month period (e.g., the defendant engaged in criminal conduct rather than regular, legitimate employment; or the defendant's legitimate employment was merely a front for the defendant's criminal conduct).

It is conceded that there was a "pattern of criminal conduct" for Mr. Mayfield, but defendant challenges the assertion that he engaged in the criminal conduct as a livelihood.[6]

Mr. Mayfield has a solid history of regular, legitimate employment dating back to 1997. He worked for the airline industry since 1998 and worked for Southwest Airlines for 10 years until he was terminated in 2015.  There is no question that Mr. Mayfield's criminal conduct overlapped with his legitimate employment and that he abused a position of trust, but his employment was not merely a front, and it was not a main source of income rising to the level of criminal livelihood. There is very little Ninth Circuit case law on the issue of criminal livelihood, most of it being non-specific or brief references in unpublished cases. The Government bears the burden of proof when it seeks to increase a defendant's offense level. *United States v. Howard*, 894 F.2d1085, 1090 (9th Cir. 1990). The Government must meet the preponderance of the

---

[6]The PSR ignores the mathematical component of this adjustment to the extent of any proof that the income derived from the pattern of criminal conduct in any twelve-month period exceeded 2,000 times the then existing minimum wage under federal law.  As described earlier in this memorandum, the probation officer throws around lump sums that were part of the banking and income investigation for Mr. Mayfield, but has failed to acknowledge or investigate alternative sources.

**DEFENDANT MAYFIELD'S**
**SENTENCING MEMORANDUM**

1   evidence standard. Id. Defendant submits that there is a failure of proof in this case to justify the

2   two level adjustment for criminal livelihood.

3   **B.   Aggravating Role**

4          The probation officer has assessed a three level aggravated role adjustment for Mr.

5   Mayfield based on a conclusion that Mr. Mayfield was a manager or supervisor and the criminal

6   activity involved five or more participants or was otherwise extensive.  (PSR ¶ 50, USSG

7   §3B1.1(b)). The probation officer believes this conclusion is supported by Mr. Mayfield's cell

8   phone use, and that "during this extensive scheme, [Mayfield] provided co-conspirators with

9   directives, provided instructions to couriers, recruited co-defendant Sophia West, and a

10  significant amount of illegal proceeds deposited in his bank account." As to the allegation of

11  defendant's aggravating role in the offense, USSG §3B1.1 directs the Court to increase the

12  offense level as follows:

13         **(a)**  If the defendant was an organizer or leader of a criminal activity that
           involved five or more participants or was otherwise extensive, increase by
14          4 levels.

15         **(b)**  If the defendant was a manager or supervisor (but not an organizer or
           leader) and the criminal activity involved five or more participants or was
16         otherwise extensive, increase by 3 levels.

17         **(c )** If the defendant was an organizer, leader, manager, or supervisor in
           any criminal activity other than described in (a) or (b), increase by 2 levels.
18
19  Here, defendant Mayfield does not contest the issue that the criminal activity involved five or

20  more participants or was otherwise extensive, but objects to the conclusion that he had a role in

21  the offense as a manager or supervisor.[7]

22         Fellow baggage handlers Videau and Fleming did the same exact thing as Mr. Mayfield

23  and they were not assessed an aggravating role enhancement.  While the three may have

24  _____

25         [7] In distinguishing a leadership and organizational role from one of mere management or
    supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should
26  consider include the exercise of decision making authority, the nature of participation in the
    commission of the offense, the recruitment of accomplices, the claimed right to a larger share
27  of the fruits of the crime, the degree of participation in planning or organizing the offense, the
    nature and scope of the illegal activity, and the degree of control and authority exercised over
28  others. There can, of course, be more than one person who qualifies as a leader or organizer of
    a criminal association or conspiracy. USSG §3B1.1 Application Note (4)

**DEFENDANT MAYFIELD'S**
**SENTENCING MEMORANDUM**

1    conspired with one another, there is no proof that Mr. Mayfield in any way controlled, managed,

2    or supervised Videau or Fleming.  Mr. Mayfield ended up breaking the law many more times

3    than Videau or Fleming, but that does not make him a manager or supervisor.

4         Mr. Mayfield was a cog in the wheel of the criminal scheme to distribute marijuana to

5    places all over the country.  He played an instrumental role because he facilitated the actual

6    transport of the drugs.  Without him, the scheme would not have worked, but that is true of a

7    number of the participants, including the marijuana suppliers, the financiers, the recruiters, the

8    couriers, and the picking up, sales, and delivery people in the various locations. There was a

9    person or persons who coordinated all the activity, and it was not Mr. Mayfield.  He did not have

10   decision making authority.  He did not (1) produce the marijuana, (2) store, package, or furnish

11   the marijuana, (3) he did not plan the trips, (4) he did not recruit the couriers, including Sophia

12   West; (5) he did not control or coordinate the picking up of the marijuana in various cities; he did

13   not distribute the marijuana once delivered; and (5) he did not control the money or reap the

14   massive profits that had to be generated from such an operation.  He got paid for the individual

15   service he rendered for breaching security and then laundered his basic wage, but this gain was

16   relatively minor, well less than a thousand dollars per transaction. That money adds up, but it is

17   not on the level of wholesale drug distribution and the income of major traffickers,   He did not

18   claim or obtain any right to a larger share of the fruits of the crime.  He did not have control or

19   authority over others, other than to coordinate the bag switches and cargo shipments at the

20   airport.  Under these circumstances, he is not deserving of an aggravated role adjustment.

21        The justification for the aggravating role adjustment set out in Probation Officer's

22   Response to Objection Number within the Addendum to the PSR is that Mr. Mayfield "had

23   contact with numerous charged and uncharged co-conspirators regarding the offense, provided

24   them with directives, and recruited couriers, specifically Sophia West." First of all, having

25   contact with conspirators does not justify an aggravated role.  By the literal terms of the

26   aggravating provision, there has to be management or supervision.  There was not.  It is unclear

27   exactly what "directives" the probation officer is referring to in terms of contact with

28   conspirators, but it is patently clear in this case that Mr. Mayfield was not directing or controlling

**DEFENDANT MAYFIELD'S
SENTENCING MEMORANDUM**

11

1  the activity, save for coordinating bag switches and mailing cargo packages.  That activity is

2  submitted to not be enough to substantiate an aggravating role.  Defendant Mayfield denies

3  recruiting couriers, and specifically denies recruiting Sophia West.  They were social

4  acquaintances, yes, but he did not bring her into the scheme and was not responsible for her

5  payment.  In the government's sentencing memorandum for Ms. West, the government states

6  "By her own admission, defendant [West] indicated that she wanted to participate in the

7  smuggling scheme after she learned about it from others that were involved and discussing the

8  operation." [Dkt. No. 246, 2:27-3:1.] That does not sound like recruitment by Mr. Mayfield.

9       Ninth Circuit case law on the issue of aggravated role has considered relevant whether the

10  defendant exercised decision making authority in the procurement and distribution of narcotics.

11  *United States v. Ponce*, 51 F.3d 820 (9th Cir. 1995). Likewise, courts have examined whether the

12  defendant, in addition to having exercised authority over others, had coordinated the distribution

13  of drugs received from out-of-state sources, had initiated drug deals with an undercover officer,

14  had negotiated the terms of the drug deals, and had set their locations and times. *United States v.*

15  *Salcido-Corrales*, 249 F.3d 1151, 1154-55.  (9th Cir. 2001) In the most recent decision regarding

16  aggravating role adjustments, *United States v. Holden*, 2018 U.S.App. LEXIS 20816 (9th Cir.

17  July 26, 2018) the Ninth Circuit has emphasized that for an aggravating role to apply "some

18  degree of control or organizational authorities is required" and "[m]ere facilitation of criminal

19  activity is not sufficient to support the enhancement". (citing, *United States v. Doe*, 778 F.3d 814,

20  826 (9th Cir 2015) and *United States v. Avila*, 95 F.3d 887, 890 (9th Cir. 1996). It is not sufficient

21  that a defendant organized property or activities - the defendant must have organized participants.

22  *Doe*, supra, at 824 n.4. It is clear in the present case that Mr. Mayfield was a facilitator of the

23  marijuana distribution scheme, and not a controller or  organizer of participants in the scheme.

24  An aggravating role enhancement for Mr. Mayfield is not appropriate.

25  **C.    Safety Valve**

26       If there is no criminal livelihood adjustment or role in the offense enhancement, Mr.

27  Mayfield is eligible for a safety valve adjustment based on his lack of criminal record. (USSG

28  §5C1.2(a)(1)-(4)) This possibility was accounted for in the plea agreement entered in to by Mr.

**DEFENDANT MAYFIELD'S
SENTENCING MEMORANDUM**

1    Mayfield, but is not discussed in the PSR, despite the fact that it was addressed in the letter to the

2    probation officer regarding the draft PSR.

3          Defendant Mayfield does not have more than one criminal history point, there was no

4    violence associated with his criminal offenses and there was no death or serious injury involved

5    with his conduct.  The only provision preventing him from eligibility for the safety valve is the

6    potential aggravating role enhancement as a manager or supervisor.(USSG §5C1.2(a)(4)).

7    Should the Court determine that Mr. Mayfield is potentially able to qualify for the safety valve,

8    there would still be a requirement for a truthful proffer to the government regarding his offense

9    conduct pursuant to USSG §5C1.2(a)(5).  Such a session has not been practical or realistic given

10   the disagreements as to the guideline calculations and the need for the Court to resolve the

11   various issues.  A continuance of the sentencing may be necessary should the Court determine

12   that Mr. Mayfield is not deserving of an aggravated role adjustment, such that he can meet with

13   the government and qualify for the safety valve.

14   **D.    Disparity in Sentencing**

15         The probation officer in this case blankly states in the PSR that she has not identified any

16   factors that would warrant departure or variance from the applicable advisory guideline range.

17   (PSR ¶¶ 128, 129) The issue of disparity in sentencing issue pursuant to 18 U.S.C. §3553(a)(6)

18   was specifically addressed in the letter to the probation officer regarding the draft PSR, but

19   receives no mention in the final PSR filed with the Court. The bare facts are that Mr. Mayfield

20   has never spent more than one day in jail, the longest sentence handed out for any of the co-

21   defendants in this case was 27 months (Holland), and the two similarly situated Southwest

22   Airlines baggage handler defendants, Mr. Videau and Mr. Fleming, received sentences of 15

23   months and 21 months respectively. In determining the particular sentence to be imposed, the

24   Court "shall consider ..... the need to avoid unwarranted sentencing disparities among defendants

25   with similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a)(6).

26   This sentencing factor will be discussed in the section below (V.) as to the analysis pursuant to

27   18 U.S.C. §3553(a).

28

**DEFENDANT MAYFIELD'S**
**SENTENCING MEMORANDUM**

1

## IV.

2

## SENTENCING RECOMMENDATION BY THE PROBATION OFFICER

3      The probation officer is recommending a 97 month sentence for Mr. Mayfield, eight years

4  and one month in prison. Defendant Mayfield strenuously disagrees with this recommendation,

5  both because it is so founded on unsubstantiated statements by the government (e.g. smuggling

6  luggage containing marijuana on 75-80 occasions, and collecting $122,900 in drug proceeds - as

7  discussed in the objections to the PSR content), and because it simply does not provide a valid

8  justification to send a 38 year old man with no prior criminal record to jail for that substantial a

9  period of time. These crime of opportunity offenses involved marijuana, a substance arguably on

10  a path to general legalization, as opposed to other far more dangerous controlled substances. This

11  is not to downplay the absolute danger inherent to violations of airport security and to the general

12  public and professionals traveling on airplanes, but those dangers fortunately did not come in to

13  play in this case. There is actually a surprising element of this case as to the vulnerability of

14  airports and the relatively minimal and inconsistent security procedures for airline travel and the

15  monitoring of hundreds of almost minimum wage workers. Here, there were no weapons, no

16  violence, and no physical injuries, and Mr. Mayfield was basically a tool for an organized drug

17  distribution ring. He was clearly not a leader, organizer, manager, supervisor, controller, or

18  director of the operation. For reasons still not clear, but probably related to a greater

19  investigation, the government knew that the marijuana trafficking was ongoing through the

20  Oakland airport with multiple participants manipulating security procedures for almost two years,

21  and they chose not to shut it down. This is by no means a justification for the illegal conduct of

22  Mr. Mayfield, but it is submitted that there is no realistic justification presented by the probation

23  officer that he should be imprisoned until he is over 45 years old for his conduct.

24

## V.

25

### ANALYSIS PURSUANT TO 18 U.S.C. § 3553(a)
### AND SENTENCING RECOMMENDATION

26

27      The primary directive in § 3553(a) is that the court must impose a sentence that is

28  "sufficient, but not greater than necessary, to comply with" the purposes of sentencing. *See*, 18

**DEFENDANT MAYFIELD'S**
**SENTENCING MEMORANDUM**

1    U.S.C. § 3553(a) Those purposes include the need:  (1) to provide just punishment; (2) to create

2    adequate deterrence; (3) to protect the public; and (4) to provide the defendant necessary

3    treatment and training.  18 U.S.C. § 3553(a)(2) The calculation of the advisory guidelines in this

4    case is seriously in dispute, with a potential swing of as many as seven levels, with a potential

5    level 30 with aggravating factors and a level 23 accounting for a safety valve adjustment.[8]  The

6    Court has discretion to sentence Mr. Mayfield below the applicable guideline range as long as the

7    sentence is not unreasonable in light of the other 3553(a) factors.

8        The background of Mr. Mayfield has been aptly summarized within the PSR (¶¶ 67 - 100)

9    and has been made known to the Court in the process of establishing exceptional circumstances

10   to justify his continued release after his guilty pleas. The letters by Mr. Mayfield and his wife,

11   and the support letters from his friends, family, and associates that were attached to defendant

12   Mayfield's  Pretrial Memorandum Re: Exceptional Reasons That He Remain Out of Custody

13   Pending Sentencing (Dkt. No. 472) are attached hereto for the Court's convenience. From the

14   materials submitted, it is clear that Mr. Mayfield has a wealth of community support and that he

15   has done a lot of positive, constructive things for his family, friends, and members of his

16   community.  He very clear made a tremenddous mistake getting involved in the charged drug

17   transactions and airport security violations, but he has bounced back and gotten himself back on

18   track and performed flawlessly on pretrial release. He has a very close and supportive family and

19   five children he loves that he wants to return to as soon as possible**.**

20       In terms of sentencing disparity with his co-defendants, the sentence recommended by the

21   probation officer is grossly out of proportion to the sentences already imposed in this case. Mr.

22   Holland was the convicted felon marijuana distributor and money launderer, and the suggested

23   sentence for Mr. Mayfield is over three times as long as the 27 month sentence imposed for Mr.

24   Holland. The recommended sentence for Mr. Mayfield is four times or more the sentence

25   imposed on Mr. Mayfield's fellow baggage handlers, Videau and Fleming. Such a disparity

26   makes no sense and is unfair. Mr. Mayfield has admitted to trafficking between 200 to 400 kilos

27

28       [8] With Mr. Mayfield at a Criminal History Category 1, the level 30 advisory range is 97 to
     120 months and a level 23 advises 46-57 months.

**DEFENDANT MAYFIELD'S**
**SENTENCING MEMORANDUM**

1   of marijuana and faces a five year mandatory sentence. With a safety valve finding he could face

2   an advisory guideline sentence of just less than five years. A sentence of anything in the 4-5 year

3   range is submitted to provide a just and adequate punishment, and to protect the public. The

4   Court can be assured that while incarcerated Mr. Mayfield will take advantage of every

5   opportunity of treatment or training made available to him. He soundly realizes the errors he has

6   made and all he want to do is get back to his wife and family, raise his kids, and be a productive

7   member of society.

8   **<u>CONCLUSION</u>**

9       For the foregoing reasons, Defendant requests this Court to impose the sentence

10   suggested above. Defendant requests the Court to allow him to voluntarily surrender when the

11   custodial sentence is imposed, and to recommend to the Bureau of Prisons that he be housed as

12   close to the Bay Area as possible. It is unnecessary to impose a fine in this case. A forfeiture of

13   $50,000.00 has already been ordered by the Court and was agreed to in the plea agreement.

14

15

16   Dated: August 9, 2018                   Respectfully submitted,

17

18                                 /s/\
                         ROBERT WAGGENER

19                          Attorney for Defendant\
                         Keith Ramon Mayfield

20

21

22

23

24

25

26

27

28

**DEFENDANT MAYFIELD'S\
SENTENCING MEMORANDUM**

16